VIRGINIA N. GORDON, CONSERVATRIX (ESTATE OF
ARTHUR R. NAVARETTE) *v.* BRIDGEPORT HOUSING
AUTHORITY ET AL.
(13232)

PETERS, C. J., HEALEY, SHEA, CALLAHAN and GLASS, Js.

Argued April 13—decision released July 5, 1988

*Susan K. Smith,* with whom, on the brief, was *A. Susan Peck,* for the appellant (plaintiff).

*John H. Barton,* associate city attorney, for the appellees (defendant city et al.).

ARTHUR H. HEALEY, J. This appeal arises out of an action by the plaintiff, Virginia N. Gordon, conservatrix of the estate of her brother, Arthur R. Navarette, an incapable, for injuries that he suffered in a beating at the Marina Apartments housing project in Bridgeport. The defendants include the city of Bridgeport, the Bridgeport housing authority (BHA), commissioners Stephen Katz, Clarence T. Williams, Jeri Boyd, Gino Cassidy and Raymond J. Alletto of the BHA, former mayor Leonard S. Paoletta, Sr., chief of police Joseph A. Walsh, and the Bridgeport police department. The defendant city of Bridgeport filed a motion to strike the third and fourth counts of the plaintiff's complaint. The trial court, *Ripley, J.,* granted the motion as to the defendants Paoletta, Walsh, the city of Bridgeport and the Bridgeport police department and the plaintiff filed this appeal. We find no error.

The pleadings in the case reveal the following background facts. In the early evening hours on November 26, 1983, Navarette stopped at a convenience store at 321 Main Street near the Marina Apartments housing project. Navarette encountered a group of youths and one youth forcibly grabbed Navarette's wallet and fled into the project. Two other youths lured Navarette inside the project on the pretext that they would help him recover the wallet. The youths then pulled Navarette under a dark stairwell inside a building in the project and physically beat him with their fists, feet, bottles

and blunt instruments just "short of death." Navarette was admitted to Park City Hospital in a "brain dead" condition. As a result of the attack, Navarette, who currently resides at New Britain Memorial Hospital, is catastrophically brain injured and will require permanent skilled and custodial institutional care for the remainder of his life.

The plaintiff filed a four count complaint against the various defendants. The first count alleges that the BHA and the city of Bridgeport were negligent in managing and in providing security to the housing project. It also alleges that the BHA, operating in its capacity as managing agent for the city, is guilty of gross mishandling and misappropriation of funds. The second count names the individual members of the housing authority as defendants and alleges theories of negligence similar to those asserted in the first count. Neither the first nor the second count is the subject of this appeal. The third count names Paoletta and the city as defendants while the fourth count names Walsh, the police department and the city as defendants. The essence of the third and fourth counts of the complaint, referring to a "Cooperation Agreement" between the BHA and the city concerning the providing of the "usual municipal services" to the project, is that the defendants negligently created a condition conducive to crime and failed to provide adequate security at the housing project. It is also alleged that the foregoing breaches violated General Statutes § 47a-7 (a) (2) and (3)[1] (duty of a landlord to keep premises in a safe and

---

[1] General Statutes § 47a-7 (a) (2) and (3) provides: "LANDLORD'S RESPONSIBILITIES. (a) A landlord shall . . . (2) make all repairs and do whatever is necessary to put and keep the premises in a fit and habitable condition, except where the premises are intentionally rendered unfit or uninhabitable by the tenant, a member of his family or other person on the premises with his consent, in which case such duty shall be the responsibility of the tenant; (3) keep all common areas of the premises in a clean and safe condition."

habitable condition) and General Statutes § 47a-54d[2] (duty of a landlord to maintain interior lighting). The defendant city filed a motion to strike counts three and four of the complaint on the ground that the city and its employees owed no duty to Navarette. The trial court, *Ripley, J.,* granted the motion to strike, holding that the defendant city et al. owed no duty to provide police protection to Navarette, because he was an unidentifiable person within the meaning of *Shore* v. *Stonington,* 187 Conn. 147, 444 A.2d 1379 (1982). The trial court's memorandum of decision also found that the city had no duty to maintain lights and other security devices because the BHA is an independent body "corporate and politic" and therefore is not an agency of the city.

The plaintiff claims that: (1) the trial court erred in ruling that the city and its representatives owed no duty to Navarette as a matter of law; (2) the complaint sufficiently pleaded facts which, if proved, would give rise to a ministerial or "operational" construction of the city's duty; (3) the trial court erred in ruling as a matter of law that the city did not stand in an agency relationship to the BHA; (4) even if the city's duty is discretionary, the city's acts of undertaking certain obligations created a duty to a foreseeable class of persons; and (5) this court should abrogate the public duty doctrine. We conclude that none of the plaintiff's claims is persuasive.

I

Although the plaintiff raises five separate claims, her first, second, fourth and fifth claims relate to the issue

---

[2] General Statutes § 47a-54d provides: "PUBLIC HALLS. (a) Dark or poorly ventilated public halls in tenement, lodging or boarding houses shall be remedied in such manner as is deemed practicable and ordered by the board of health or enforcing agency.

"(b) The owner of each tenement house shall provide for the lighting of all public halls at night."

of whether the defendants owed a duty to Navarette and whether, under the facts well pleaded, the defendants could be held liable for negligently performing that duty.

## A

The first claim concerns whether the trial court erred in ruling that the city and its representatives owed no duty to Navarette as a matter of law. The plaintiff, however, asserts that there is a threshold inquiry in the area of municipal liability—deciding if the official acts or omissions are ministerial or discretionary—and because that is a question for the trier of fact, it is inappropriate to decide the issue on a motion to strike. The plaintiff relies heavily on a statement in *Gauvin* v. *New Haven,* 187 Conn. 180, 186, 445 A.2d 1 (1982), that "[w]hether the acts complained of in operating a city park were governmental or ministerial is a factual question which depends upon the nature of the act complained of." The plaintiff also refers to *Sestito* v. *Groton,* 178 Conn. 520, 528, 423 A.2d 165 (1979), *Tango* v. *New Haven,* 173 Conn. 203, 204, 377 A.2d 284 (1977), and a number of Superior Court cases that hold, on varying fact patterns, that the issue of governmental immunity is a question of fact.

Before reaching the precise issue before us on this claim, it is instructive to outline briefly the doctrine of municipal immunity in Connecticut. A municipality itself was generally immune from liability for its tortious acts at common law; *Ryszkiewicz* v. *New Britain,* 193 Conn. 589, 593, 479 A.2d 793 (1984); but its employees faced the same personal tort liability as private individuals. "It was once said that as a general rule governmental officers and employees were personally liable for their torts, more or less without exception, even where the governmental unit itself was protected by an immunity." W. Prosser & W. Keeton, Torts (5th Ed.

1984) § 132, p. 1056, see also G. Bermann, "Integrating Governmental and Officer Tort Liability," 77 Colum. L. Rev. 1175, 1178 (1977); 63A Am. Jur. 2d, Public Officers and Employees § 358 (1984). This court first adopted a version of qualified official immunity in 1920 in *Wadsworth* v. *Middletown,* 94 Conn. 435, 439, 109 A. 246 (1920), where we said that since certain public officials were "engaged upon a governmental duty . . . so long as they act in good faith, in the exercise of an honest judgment, and not in the abuse of their discretion, or maliciously or wantonly, they cannot be held liable." Thus, an exception to liability was carved out for discretionary acts, as long as they were not performed maliciously, wantonly or in an abuse of discretion.

This court subsequently adopted the public duty doctrine, which provided even more immunity to public officials. *Leger* v. *Kelley,* 142 Conn. 585, 589–90, 116 A.2d 429 (1955). Reaffirming the public duty doctrine in *Shore* v. *Stonington,* supra, 152, we said: " '[I]f the duty which the official authority imposes upon an officer is a duty to the public, a failure to perform it, or an inadequate or erroneous performance, must be a public and not an individual injury, and must be redressed if at all in some form of public prosecution. On the other hand, if the duty is a duty to the individual, then a neglect to perform it or to perform it properly, is an individual wrong, and may support an individual action for damages.' *Leger* v. *Kelley,* [supra]; see also *South* v. *Maryland,* 59 U.S. (18 How.) 396, 402–403, 15 L. Ed. 433 (1855); *Massengill* v. *Yuma County,* 104 Ariz. 518, 521, 456 P.2d 376 (1969); 2 Cooley, Torts (4th Ed.) § 300; 63 Am. Jur. 2d, Public Officers and Employees § 287; 65 C.J.S., Negligence § 4 (8); annot., 41 A.L.R.3d 700."

The court in *Shore* also went on to say: "Policy considerations have also resulted in the establishment of

certain exceptions which provide that an individual cause of action may be brought against an official for breach of duty without regard to whether the duty is technically a public or private one." Id., 153. The *Shore* opinion outlined limited exceptions to the rule that officials who undertake discretionary actions are immune from civil liability. "[W]here the duty of the public official to act is not ministerial but instead involves the exercise of discretion, the negligent failure to act will not subject the public official to liability unless the duty to act is clear and unequivocal." Id. One exception is when "it would be apparent to the public officer that his failure to act would be likely to subject an identifiable person to imminent harm." Id.; see, e.g., *Sestito* v. *Groton,* supra, 528. Another exception is where "a statute may specifically provide for a cause of action against an official or a municipality for failure to enforce certain laws, such as those designed to prevent disturbances of the peace by riotous assemblies. See, e.g., *Sestito* v. *Groton,* supra, 523–24 (General Statutes § 7-108)." *Shore* v. *Stonington,* supra, 154. A third exception to the general rule is where the complaint alleges an action involving malice, wantonness or intent to injure, rather than negligence. Id., 155; see, e.g., *Stiebitz* v. *Mahoney,* 144 Conn. 443, 448–49, 134 A.2d 71 (1957); *Medeiros* v. *Kondo,* 55 Hawaii 499, 503, 522 P.2d 1269 (1974); 63 Am. Jur. 2d, Public Officers and Employees § 290.

This court has also discussed extensively the difference between a ministerial and a discretionary act. "A municipality is immune from liability for the performance of governmental acts as distinguished from ministerial acts. Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature. . . . On the other hand, ministerial acts are performed in a prescribed manner without the exercise of judgment or discretion

as to the propriety of the action." *Gauvin* v. *New Haven,* supra, 184; *Tango* v. *New Haven,* supra, 204–205; *Wright* v. *Brown,* 167 Conn. 464, 471, 356 A.2d 176 (1975); see General Statutes § 52-557n.[3] The public/private duty distinction and the ministerial/discretionary test may appear to overlap and this has resulted in a lack of consistent analysis by this state's courts. Compare *Tango* v. *New Haven,* supra (ministerial/discretionary test), and *Fraser* v. *Henninger,* 173 Conn. 52, 60, 376 A.2d 406 (1977) (ministerial/discretionary test), with *Trautman* v. *Stamford,* 32 Conn. Sup. 258, 262, 350 A.2d 782 (1975) (public/private duty test); see note,

[3] General Statutes § 52-557n provides: "LIABILITY OF POLITICAL SUBDIVISION AND ITS EMPLOYEES, OFFICERS AND AGENTS. (a) (1) Except as otherwise provided by law, a political subdivision of the state shall be liable for damages to person or property caused by: (A) The negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties; (B) negligence in the performance of functions from which the political subdivision derives a special corporate profit or pecuniary benefit; and (C) acts of the political subdivision which constitute the creation or participation in the creation of a nuisance; provided, no cause of action shall be maintained for damages resulting from injury to any person or property by means of a defective road or bridge except pursuant to section 13a-149. (2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law.

"(b) Notwithstanding the provisions of subsection (a) of this section, a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from: (1) The condition of natural land or unimproved property; (2) the condition of a reservoir, dam, canal, conduit, drain or similar structure when used by a person in a manner which is not reasonably foreseeable; (3) the temporary condition of a road or bridge which results from weather, if the political subdivision has not received notice and has not had a reasonable opportunity to make the condition safe; (4) the condition of an unpaved road, trail or footpath, the purpose of which is to provide access to a recreation or scenic area, if the political subdivision has not received notice and has not had a reasonable opportunity to make the condition safe; (5) the initiation of a judicial or administrative

"The Official Responsibility Rule and its Implications for Municipal Liability in Connecticut: *Shore* v. *Town of Stonington*," 15 Conn. L. Rev. 641, 647 (1983). Whether a public or private duty is established, there is no potential liability if the act complained of is a discretionary act that does not fit into any of the narrow exceptions outlined in *Shore*. The finding of a public duty is often, but not always, dispositive of whether the act is a discretionary one. See, e.g., *Trautman* v. *Stamford*, supra, 263 (demurrer sustained upon reaching conclusion of patrolmen's duty to general public). In other cases, however, a breach of a public duty may

proceeding, provided that such action is not determined to have been commenced or prosecuted without probable cause or with a malicious intent to vex or trouble, as provided in section 52-568; (6) the act or omission of someone other than an employee, officer or agent of the political subdivision; (7) the issuance, denial, suspension or revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such failure or refusal constitutes a reckless disregard for health or safety; (8) failure to make an inspection or making an inadequate or negligent inspection of any property, other than property owned or leased by or leased to such political subdivision, to determine whether the property complies with or violates any law or contains a hazard to health or safety, unless the political subdivision had notice of such a violation of law or such a hazard or unless such failure to inspect or such inadequate or negligent inspection constitutes a reckless disregard for health or safety under all the relevant circumstances; (9) failure to detect or prevent pollution of the environment, including groundwater, watercourses and wells, by individuals or entities other than the political subdivision."

This state's doctrine of governmental immunity accords with the doctrine of governmental immunity as announced by the United States Supreme Court in *Nixon* v. *Fitzgerald*, 457 U.S. 731, 744, 102 S. Ct. 2690, 73 L. Ed. 2d 349 (1982). There it stated: "[T]his court consistently has recognized that government officials are entitled to some form of immunity from suits for civil damages." "As recognized at common law, public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." *Harlow* v. *Fitzgerald*, 457 U.S. 800, 806, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). Federal law also recognizes the distinction between discretionary and ministerial acts. Id., 816–17; see also *Payton* v. *United States*, 679 F.2d 475, 479–80 (5th Cir. 1982).

still result in liability for the official if the act that he or she negligently performs is a ministerial act. See, e.g., *Wright* v. *Brown,* supra, 471–72 (failure to quarantine dog, although a violation of a duty to the public, was ministerial act and demurrer overruled). Thus, although the public duty doctrine provides the starting point of the analysis, distinctions between discretionary acts and ministerial acts are often controlling without regard to whether the duty is ascertained to be public or private. *Shore* v. *Stonington,* supra, 153.

Under the framework in *Shore,* the court looks to see whether there is a public or private duty alleged by the plaintiff. If a public duty exists, an official can be liable only if the act complained of is a ministerial act or one of the narrow exceptions to discretionary acts applies. We must resolve whether the issue of a public duty can be decided on a motion to strike in this case.

The purpose of a motion to strike is to "contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted." Practice Book § 152; *Mingachos* v. *CBS, Inc.,* 196 Conn. 91, 108, 491 A.2d 368 (1985). In ruling on a motion to strike, the court is limited to the facts alleged in the complaint. *King* v. *Board of Education,* 195 Conn. 90, 93, 486 A.2d 1111 (1985). The court must construe the facts in the complaint most favorably to the plaintiff. *Amodio* v. *Cunningham,* 182 Conn. 80, 82–83, 438 A.2d 6 (1980). Notwithstanding the procedural posture of a motion to strike, this court has approved the practice of deciding the issue of governmental immunity as a matter of law. See *Shore* v. *Stonington,* supra; *Wysocki* v. *Derby,* 140 Conn. 173, 175, 98 A.2d 659 (1953); see also *Brown* v. *Branford,* 12 Conn. App. 106, 110–11, 529 A.2d 743 (1987).

The plaintiff attempts to distinguish *Shore* by asserting that it was an appeal from a summary judgment

based upon submitted evidence, and therefore the trial court sat as a factfinder in deciding a mixed question of law and fact. The plaintiff's distinctions are not persuasive and we conclude that the analysis in *Shore* controls this case. In *Shore,* we noted: " 'Negligence is a breach of duty.' *Urban* v. *Hartford Gas Co.,* 139 Conn. 301, 304, 93 A.2d 292 (1952). It is important to distinguish between the existence of a duty and the violation of that duty. The plaintiff argues that summary judgment is inappropriate in this area because there existed a genuine dispute as to the material facts relating to the extent of [a police officer's] duty to the plaintiff's decedent. The law does not recognize a 'duty in the air.' See Pollock, Torts (13th Ed.) 468; Winfield, 'Duty in Tortious Negligence,' 34 Colum. L. Rev. 41, 42 n.8 (1934). To sustain a cause of action, the court must determine whether the defendant owed a duty to the plaintiff's decedent; *Coburn* v. *Lenox Homes, Inc.,* 186 Conn. 370, 375, 441 A.2d 620 (1982); and the applicable standard of care. *Fidelity & Casualty Co.* v. *Constitution National Bank,* 167 Conn. 478, 482, 356 A.2d 117 (1975). The existence of a duty is a question of law. *Nolan* v. *The New York, New Haven & Hartford Railroad Co.,* 53 Conn. 461, 471, 4 A. 106 (1885); Winfield, supra, 43. Only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. See Green, 'The Duty Problem in Negligence Cases,' 28 Colum. L. Rev. 1014, 1029–30 (1928)." *Shore* v. *Stonington,* supra, 151–52.

It is the existence of a duty that is the dispositive factor concerning the motion to strike in this case. To survive a motion to strike, the court must determine that the defendants owed a duty to the plaintiff's incapable. The existence of this duty is a matter for the court to decide, not a jury. Id. The plaintiff's claim that the trial court was precluded from deciding on a motion

to strike whether the defendants owed a duty to the plaintiff's incapable is unavailing.

B

The plaintiff next asserts that the facts pleaded in her complaint, construed most favorably to her, would give rise to a violation of a ministerial duty by the defendants. As explained above, a ministerial duty is one imposed for acts performed without the exercise of discretion. *Gauvin* v. *New Haven,* supra. The third and fourth counts allege that the city failed to provide either adequate security or police protection to this housing project that the plaintiff claims was *owned* by the city. The trial court implicitly determined, as a matter of law, that the city did not own this housing project. Although the trial court did not specifically state that the city of Bridgeport was not the owner of the Marina Apartments housing project, it did determine that the city did not have responsibility to maintain the premises since the "Housing Authority is an independent body corporate and politic [General Statutes § 8-40] and is not an agency of the city." It would be incongruous to believe that the trial court would factor into its decision concerning responsibility for maintenance of the housing project the issue of agency without having previously decided that the city itself did not own the project. Had the city owned the project, a discussion about agency by the trial court would have been unnecessary.

The trial court, in considering the statutory scheme in passing upon the allegations of the relevant counts, could determine, as a matter of law, that the BHA, which was a separate corporate entity from the city of Bridgeport, "owned" this project. The trial court could make this determination in construing the statutory scheme of part I of chapter 128 of the General Statutes. The interpretation of a statute is a question of law,

not fact. *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 6, 434 A.2d 293 (1980). General Statutes § 8-40[4] provides: "In each municipality of the state there is created a public body corporate and politic to be known as the 'housing authority' of the municipality . . . ." There can be no question under the allegations of the complaint that the BHA is "a public body corporate and politic" under the statute and, therefore, is a viable corporate entity capable of executing the powers conferred and subject to the liabilities directly attendant to its statutory being under the statutory scheme of part I of chapter 128 of the General Statutes. Among its powers, the BHA could "own" real property as it admittedly did. General Statutes § 8-44.[5] It could also "operate" a housing project

[4] General Statutes § 8-40 provides: "CREATION OF HOUSING AUTHORITIES. In each municipality of the state there is created a public body corporate and politic to be known as the 'housing authority' of the municipality; provided such authority shall not transact any business or exercise its powers hereunder until the governing body of the municipality by resolution declares that there is need for a housing authority in the municipality, provided it shall find (1) that insanitary or unsafe inhabited dwelling accommodations exist in the municipality or (2) that there is a shortage of safe or sanitary dwelling accommodations in the municipality available to families of low income at rentals they can afford or (3) that there is a shortage of safe or sanitary dwelling accommodations in the municipality available to families of moderate income at rentals they can afford. In determining whether dwelling accommodations are unsafe or insanitary, said governing body may take into consideration the degree of overcrowding, the percentage of land coverage, the light, air, space and access available to the inhabitants of such dwelling accommodations, the size and arrangement of the rooms, the sanitary facilities and the extent to which conditions exist in such buildings which endanger life or property by fire or other causes. The governing bodies of two or more municipalities may create a regional housing authority, which shall have all the powers, duties and responsibilities conferred upon housing authorities by this chapter and chapter 130. The area of operation of such authority shall include the municipalities for which such authority is created. Such authority shall act through a board of commissioners composed of two representatives from each municipality appointed for terms of four years in the manner provided in section 8-41."

[5] General Statutes § 8-44 provides: "POWERS OF AUTHORITY. An authority shall constitute a public body corporate and politic, exercising public

as it did. General Statutes § 8-44. Even though the "chief executive officer" of the governing body of a

powers and having all the powers necessary or convenient to carry out the purposes and provisions of this chapter, including the following enumerated powers in addition to others granted by any provision of the general statutes: (a) To sue and be sued; to have a seal and to alter the same at pleasure; to have perpetual succession; to make and execute contracts and other instruments necessary or convenient to the exercise of the powers of the authority; and to make and from time to time amend and repeal bylaws, rules and regulations not inconsistent with this chapter to carry into effect the powers and purposes of the authority; (b) within its area of operation, to prepare, carry out, acquire, lease and operate housing projects and to provide for the construction, reconstruction, improvement, alteration or repair of any housing project or any part thereof either directly or in the form of loans or other similar assistance to developers, all such housing projects where families with children are eligible for occupancy to contain reasonably adequate outdoor playground areas; (c) to arrange or contract for the furnishing by any person or agency, public or private, of services, privileges, works or facilities for, or in connection with, a housing project or the occupants thereof; (d) to demise any dwellings, houses, accommodations, lands, buildings, structures or facilities embraced in any housing project and, subject to the limitations contained in this chapter, to establish and revise the rents or charges therefor; to own, hold and improve real or personal property; to purchase, lease, obtain options upon or acquire, by gift, grant, bequest, devise or otherwise, any real or personal property or any interest therein, provided no real property or interest therein shall be acquired for the site of a proposed housing project until the housing authority has held a public hearing concerning such site, notice of which has been published in the form of a legal advertisement in a newspaper having a substantial circulation in the municipality at least twice at intervals of not less than two days, the first not more than fifteen nor less than ten days, and the last not less than two days, before such hearing; to insure or provide for the insurance of any real or personal property or operations of the authority against any risks or hazards; to procure insurance or guarantees from the federal government of the payment of any debts or parts thereof, whether or not incurred by such authority, secured by mortgages on any property included in any of its housing projects; (e) to invest any funds held in reserves or sinking funds, or any funds not required for immediate disbursements, in investments legal for mutual savings banks, provided that the provisions of subdivision (b) of subsection (14) of section 36-96 shall not be applicable to any such investment, and to purchase its bonds at a price not more than the principal amount thereof and accrued interest, all bonds so purchased to be cancelled; (f) within its area of operation, to investigate living, dwelling and housing conditions and the means and methods of improving such conditions; to determine where slum areas exist

municipality (Bridgeport) "appoint[s] . . . the comis-
sioners of the [housing] authority"; General Statutes
§ 8-41;[6] it is the housing authority, not the municipal-

or where there is a shortage of decent, safe and sanitary dwelling accom-
modations for families of low and moderate income; to make studies and
recommendations relating to the problem of clearing, replanning and recon-
structing slum areas, and the problem of providing dwelling accommoda-
tions for families of low and moderate income, and to cooperate with the
municipality or the state or any political subdivision thereof in action taken
in connection with such problems; (g) to promote the construction of hous-
ing for low and moderate income persons and families, either directly or
through an agency or instrumentality designated or appointed by the author-
ity, by lending or otherwise making available to developers the proceeds
from the sale of obligations which are tax-exempt pursuant to the provi-
sions of Section 103 (b) (4) (A) of the Internal Revenue Code of 1954, as
amended, or Section 11 (b) of the United States Housing Act of 1937, as
amended, or any successor provisions amendatory or supplementary thereto,
provided no such obligations or other notes or securities issued by any agency
or instrumentality designated or approved by the authority pursuant to the
provisions of this subdivision, shall create or imply any indebtedness of any
kind on the part of the housing authority, the state, or any political subdi-
vision thereof; and (h) to exercise all or any part or combination of powers
herein granted. No provision of law with respect to the operation or dispo-
sition of property by other public bodies shall be applicable to an authority
unless the general assembly specifically so states. All contracts to be made
or let for work, supplies, or for purchases of personal property of every
description, shall be publicly advertised, for the purpose of receiving bids
upon the same, in a local daily paper and, if deemed advisable, in other
papers, provided the several parts of such work, supplies or personal prop-
erty shall, together, involve the expenditure of more than five thousand
dollars. The bids received in response to such public advertisement shall
be publicly opened at a hearing of the authority, the date and time of such
hearing being named in such public advertisement, and the contract or
award shall be made by the authority with or to the lowest responsible bid-
der. Such bidding may be waived by vote of the authority when the public
interest so requires, provided the reasons for such waiver shall be set forth
and made public and provided the total cost of such work, supplies or per-
sonal property shall not exceed ten thousand dollars. In any contract let
in connection with a housing project, an authority, notwithstanding any
provision to the contrary in this chapter or in any other statute, may include
stipulations requiring that the contractor and any subcontractors comply
with requirements as to minimum wages, maximum hours and any condi-
tions which the federal government or any other obligee may have imposed
as prerequisite to the granting of financial aid to the housing project."

   [6] General Statutes § 8-41 provides: "APPOINTMENT, QUALIFICATIONS AND
TENURE OF COMMISSIONERS. (a) When the governing body of a municipal-

ity, who "shall protect and save harmless any commissioner . . . from financial loss and expense, including legal fees and costs, if any, arising out of any claim,

ity other than a town adopts a resolution as described in section 8-40, it shall promptly notify the chief executive officer of such adoption. Upon receiving such notice, the chief executive officer shall appoint five persons who are residents of said municipality as commissioners of the authority. If the governing body of a town adopts such a resolution, such body shall appoint five persons who are residents of said town as commissioners of the authority created for such town. The commissioners who are first so appointed shall be designated to serve for one, two, three, four and five years, respectively, from the first day of the month next succeeding the date of their appointment, and annually thereafter a commissioner shall be appointed to serve for five years except that any vacancy which may occur because of a change of residence by a commissioner, removal of a commissioner, resignation or death shall be filled for the unexpired portion of the term. At least one of such commissioners shall be a tenant who lives in housing owned or managed by such authority, if any exists, provided that any such tenant shall have resided in such housing for more than one year, and provided further that no such tenant shall have the authority to vote on any matter concerning the establishment or revision of the rents to be charged in any housing owned or managed by such authority. If, on October 1, 1979, a municipality has adopted a resolution as described in section 8-40, but has no tenants serving as commissioners, the chief executive officer of a municipality other than a town or the governing body of a town shall appoint a tenant who meets the qualifications set out in this section as a commissioner of such authority when the next vacancy occurs. No commissioner of an authority may hold any public office in the municipality for which the authority is created. A commissioner shall hold office until his successor is appointed and has qualified. A certificate of the appointment or reappointment of any commissioner shall be filed with the clerk and shall be conclusive evidence of the legal appointment of such commissioner, after he has taken an oath in the form prescribed in the first paragraph of section 1-25. The powers of each authority shall be vested in the commissioners thereof. Three commissioners shall constitute a quorum. Action may be taken by the authority upon a vote of not less than a majority of the commissioners present, unless the bylaws of the authority require a larger number. The chief executive officer, or, in the case of an authority for a town, the governing body of the town, shall designate which of the commissioners shall be the first chairman, but when the office of chairman of the authority becomes vacant, the authority shall select a chairman from among its commissioners. An authority shall select from among its commissioners a vice chairman, and it may employ a secretary, who shall be executive director, and technical experts and such other officers, agents and employees, permanent and temporary, as it requires, and shall deter-

demand, suit or judgment by reason of alleged negligence . . . on the part of such commissioner . . . while acting in the discharge of his duties." General Statutes § 8-41a.[7] A housing "authority" has the "power to issue bonds," and such "bonds and other obligations of [a housing authority] shall not be obligations of the municipality." General Statutes § 8-52.[8] This is

mine their qualifications, duties and compensation, provided, in municipalities having a civil service law, all appointments and promotions, except the employment of the secretary, shall be based on examinations given and lists prepared under such law, and, except so far as may be inconsistent with the terms of this chapter, such civil service law and regulations adopted thereunder shall apply to such housing authority and its personnel. For such legal services as it requires, an authority may employ its own counsel and legal staff. An authority may delegate any of its powers and duties to one or more of its agents or employees. A commissioner, or any employee of the authority who handles its funds, shall be required to furnish an adequate bond. The commissioners shall serve without compensation, but shall be entitled to reimbursement for their actual and necessary expenses incurred in the performance of their official duties.

"(b) Any tenant organization composed of tenants residing within units owned or managed by the appointing authority may indicate to such authority its desire to be notified of any pending appointment of any such commissioner. A reasonable time before appointing any such commissioner, the appointing authority shall notify any such tenant organization and, in making such appointment, such authority shall consider tenants suggested by such tenant organizations."

[7] General Statutes § 8-41a provides: "LIABILITY OF AUTHORITY FOR ACTIONS OF COMMISSIONERS AND EMPLOYEES. Each housing authority shall protect and save harmless any commissioner or any full-time employee of such authority from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of such commissioner or such employee while acting in the discharge of his duties."

[8] General Statutes § 8-52 provides: "BONDS. An authority shall have the power to issue bonds, from time to time, in its discretion, for any of its corporate purposes. An authority may issue such types of bonds as it determines, including, without limiting the generality of the foregoing, bonds on which the principal and interest are payable (a) exclusively from the income and revenues of the housing project financed with the proceeds of such bonds; (b) exclusively from the income and revenues of certain designated housing projects, whether or not they are financed in whole or in part with the proceeds of such bonds; or (c) from its revenues generally. Any such bonds may be additionally secured by a pledge of any grant or

another of the indicia of its corporate independence. Because a "housing authority" is solely a creature of statute, allegations in an action seeking to make it liable in negligence must recognize its statutory limitations. We note, in addition, that the plaintiff admitted that the city of Bridgeport did not own this project in her answers to the defendants' requests for admission. This the trial court also could have considered on the matter of ownership. See *Chevette* v. *U-Haul Co. of New*

contributions from the federal government or other source, or a pledge of any income or revenues of the authority, or a mortgage of any housing project, projects or other property of the authority. Neither the commissioners of an authority nor any person executing the bonds shall be liable personally on the bonds by reason of the issuance thereof. The bonds and other obligations of an authority shall not be obligations of the municipality or of the state or any political subdivision thereof and such bonds shall so state on their face, and neither the municipality nor the state or any political subdivision thereof shall be liable thereon nor, in any event, shall such bonds or obligations be payable out of any funds or properties other than those of such authority. The bonds shall not constitute an indebtedness within the meaning of any debt limitation or restriction. Bonds of an authority shall be authorized by its resolution and may be issued in one or more series and shall bear such date or dates, mature at such time or times, bear interest at such rate or rates, be in such denomination or denominations, be in such form, either coupon or registered, carry such conversion or registration privileges, have such rank or priority, be sold and executed in such manner, be payable in such medium of payment and at such place or places and be subject to such terms of redemption, with or without premium, as such resolution, its trust indenture or its mortgage may provide. If any commissioner or officer of the authority whose signature appears on any bonds or coupons ceases to be such commissioner or officer before the delivery of such bonds, such signature shall, nevertheless, be valid and sufficient for all purposes, the same as if he had remained in office until such delivery. Any provision of any law to the contrary notwithstanding, any bonds issued pursuant to this chapter shall be fully negotiable. In any suit, action or proceedings involving the validity or enforceability of the provisions of any bonds of an authority or the security therefor, any such bond reciting in substance that it has been issued by the authority to aid in financing a housing project to provide dwelling accommodations for persons of low income shall be conclusively deemed to have been issued for a housing project of such character and such project shall be conclusively deemed to have been planned, located and constructed in accordance with the purposes and provisions of this chapter."

*Mexico,* 7 Conn. App. 617, 510 A.2d 206 (1986). Moreover, at oral argument, counsel indicated that the plaintiff had admitted that the city of Bridgeport did not own this project. In addition, the "Cooperation Agreement" to which the plaintiff specifically refers in the allegations of the complaint speaks not only to that agreement, that "shall continue in full force and effect with respect to [this] Project only so long as *title* thereto . . . is held by the [Bridgeport Housing] Authority" (emphasis added), but also to other indicia of ownership by the BHA such as the construction and maintenance of sidewalks, curbs and gutters within the project "in the same manner as other private owners of property within the City," as well as speaking to the city's cooperation in "vacating and discontinuing any streets and alleys . . . within the Project." The trial court could properly have considered such matters in ruling on the motion to strike. See *Utley* v. *Nolan,* 134 Conn. 376, 377, 58 A.2d 9 (1948). In any event, the construction of a written contract is a question of law for the court. *Spring* v. *Nagle,* 104 Conn. 23, 26–27, 131 A.744 (1926). Thus, the plaintiff's allegations concerning the defendant city's negligence as a landlord must fail.

The plaintiff is left only with a claim that an alleged shortage of police patrols in the Marina Apartments housing project was a breach of a duty imposed by law and not simply a discretionary decision by the police department concerning deployment of its officers. The plaintiff's claims run counter to the great weight of authority that the operation of a police department is a discretionary governmental function. *Morris* v. *Washington Metropolitan Area Transit Authority,* 781 F.2d 218, 220 (D.C. Cir. 1986); *Calogrides* v. *Mobile,* 475 So. 2d 560, 561 (Ala. 1985); *Leibman* v. *Burbank,* 490 So. 2d 218, 219 (Fla. 1986). *Motyka* v. *Amsterdam,* 15 N.Y.2d 134, 138, 204 N.E.2d 635, 256 N.Y.S.2d 595 (1965); *Rion* v. *Ashland,* 110 App. Div. 2d 944, 488

N.Y.S.2d 99 (1984). "[I]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality. . . . [T]he failure to provide, or the inadequacy of, police protection usually does not give rise to a cause of action in tort against a city." 18 E. McQuillin, Municipal Corporations (3d Ed.) § 53.51. The deployment of officers is particularly a governmental function. "Considerable latitude must be allowed to [a police chief] in the deployment of his officers, or in enforcing discipline. Indeed, because a police chief's authority to assign his officers to particular duties is deemed a matter that concerns the public safety, he may not be deprived of his power to 'exercise his own discretion and judgment as to the number, qualifications and identity of officers needed for particular situations at any given time' . . . ." 16A E. McQuillin, supra, § 45.08. We conclude that the general deployment of police officers is a discretionary governmental action as a matter of law.

At oral argument, the plaintiff asserted that Navarette belonged to a foreseeable class of plaintiffs within the exception for certain discretionary acts outlined in *Shore* v. *Stonington,* supra. The plaintiff, however, has not alleged any facts to support her claim. According to the complaint, the police had no knowledge whatsoever of the robbery of Navarette, who made no attempt to notify the police, and who entered the project on his own. The facts of this case do not support the claim that Navarette was even a remotely foreseeable plaintiff. Id.; *Sestito* v. *Groton,* supra. This is a weaker case factually than *Sestito* on this aspect.

The plaintiff has included a large list of cases in her brief that hold that whether an act is ministerial or discretionary is a question of fact and is not properly resolved on a motion to strike. The crucial distinguish-

ing factor is that the duty of the municipality is unquestioned under the facts pleaded in those cases. See, e.g., *Gauvin* v. *New Haven,* supra (city had a duty to use due care in operating city park); *Tango* v. *New Haven,* supra, 205 (city had a duty to use due care in permitting the public to use city property for sled riding). In contrast, the city of Bridgeport and its employees had *no* duty, whether characterized as public or private, to provide police protection to the plaintiff's incapable under the facts alleged in the complaint. Had such a duty existed, then the plaintiff would have an opportunity to demonstrate that the defendants' actions in carrying out that duty were either ministerial or fell under an exception for discretionary acts. The well pleaded facts in this case do not reveal the existence of any duty owed to the plaintiff's incapable by the defendants. The cases cited by the plaintiff are inapposite. We conclude that the trial court did not err in deciding that the complaint did not sufficiently allege any violation of a ministerial act in carrying out the defendants' duty because the plaintiff failed to establish the existence of such a duty. The same conclusion must be made as to the failure of the allegations to fall under any exception for discretionary acts.

## C

The plaintiff's next claim is that even if the city's duty is discretionary, the city created a duty to a foreseeable class of plaintiffs by undertaking certain obligations. Specifically, the plaintiff asserts that a cooperation agreement between the city and the BHA and the city's hiring of special police officers created a duty to a foreseeable class of plaintiffs of which the plaintiff's incapable was a member—tenants of the housing project and their invitees.

Concerning the cooperation agreement, the plaintiff argues that signing the agreement was a discretion-

ary act but carrying out that agreement was a ministerial act, leading to possible liability for negligent performance of that obligation. Although making a contract may bind a municipality to perform an obligation with due care, the dispositive factor is that this contract merely promised that the defendant city would provide the Marina Apartments housing project with the same police protection that it provided to the remainder of the city's residents. We have already established that the provision of police services to a city's general population is a quintessential discretionary governmental act. The defendant city provided what it had promised. A promise to provide discretionary police services does not turn the implementation of the provision of those services into ministerial acts.

The plaintiff's claim that the hiring of six special police officers created a duty to a foreseeable class of plaintiffs is also untenable because we have already determined that the plaintiff has not alleged any facts to support her claim that Navarette belonged to a foreseeable class of plaintiffs.

### D

The plaintiff also asks this court to abrogate the public duty doctrine. The doctrine, described above, was announced in *Leger* v. *Kelley,* supra, and reaffirmed in *Shore* v. *Stonington,* supra. We recognize that the public duty doctrine has been abrogated by a number of jurisdictions. See, e.g., *Adams* v. *State,* 555 P.2d 235, 241–42 (Alaska 1976); *Ryan* v. *State,* 134 Ariz. 308, 310, 656 P.2d 597 (1982); *Leake* v. *Cain,* 720 P.2d 152, 158 (Colo. 1986); *Brennan* v. *Eugene,* 285 Or. 401, 409, 591 P.2d 719 (1979); *Petersen* v. *State,* 100 Wash. 2d 421, 432–33, 671 P.2d 230 (1983). As the defendants point out, however, a number of these jurisdictions had previously abolished governmental immunity and their courts held that a public/private duty distinction was

merely a recreation of governmental immunity. See, e.g., *Adams* v. *State*, supra; *Brennan* v. *Eugene*, supra. In other jurisdictions, other doctrines remain in effect that limit liability for government officials. See, e.g., *Leake* v. *Cain*, supra (qualified immunity in effect); *Petersen* v. *State*, supra (traditional distinction between discretionary and ministerial acts remains); see also 18 E. McQuillin, supra, § 53.04b ("[t]he states which have rejected the public duty rule have done so at least in part, on the basis that the rule is in reality nothing more than a continuation of the abolished governmental immunity doctrine"). In contrast, Connecticut has not abolished governmental immunity. See General Statutes § 52-557n.

It is also apparent that this plaintiff could not achieve a different outcome in this case even if the public duty doctrine was abrogated since the distinction between discretionary and ministerial acts would remain. See *Petersen* v. *State*, supra. The plaintiff clearly has not shown by any allegations in the challenged counts that any actions by the defendants were ministerial and has not established that any exception for discretionary acts applies. Therefore, even if the public duty doctrine were abolished, a finding that the defendants' actions were discretionary and not ministerial would preclude liability of the defendants. Although it is true that the distinction between public/private duties and discretionary/ministerial acts often overlap, the plaintiff's reasons for urging the abrogation of the public duty doctrine are unconvincing. As we said in *Rogan* v. *Board of Trustees*, 178 Conn. 579, 582, 424 A.2d 274 (1979), " '[t]he question whether the principles of governmental immunity from suit and liability can best serve this and succeeding generations has become, by force of the long and firm establishment of these principles as precedent, a matter for legislative, not judicial, determination.' "

## II

The plaintiff's next claim is that the trial court erred in ruling as a matter of law that the city of Bridgeport did not stand in an agency relationship to the BHA. The plaintiff asserts that an agency relationship exists because the municipality has the power to create the authority under General Statutes § 8-40 and it has control over the BHA by the power to appoint and remove commissioners under General Statutes § 8-41. In the alternative, the plaintiff argues that an agency relationship existed for a particular purpose, i.e., police protection, because of the "Cooperation Agreement" that existed and the claim that the city hired six police officers for all of the BHA's projects.

"Agency is defined as ' "the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act . . . ." Restatement (Second), 1 Agency § 1.' *McLaughlin* v. *Chicken Delight, Inc.,* 164 Conn. 317, 322, 321 A.2d 456 (1973). Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. Restatement (Second), 1 Agency § 1, comment b (1958)." *Botticello* v. *Stefanovicz,* 177 Conn. 22, 25, 411 A.2d 16 (1979); *Beckenstein* v. *Potter & Carrier, Inc.,* 191 Conn. 120, 132–33, 464 A.2d 6 (1983).

Although the finding of an agency relationship is ordinarily a question of fact; *Beckenstein* v. *Potter & Carrier, Inc.,* supra, 133; *Conte* v. *Dwan Lincoln-Mercury, Inc.,* 172 Conn. 112, 124, 374 A.2d 144 (1976); the plaintiff is asserting an agency relationship based

solely on the statutory scheme of part I of chapter 128 of the General Statutes. Therefore, unless the statutory scheme permits a finding of an agency relationship, there is no factual question to resolve. We conclude that part I of chapter 128 fails to permit a finding of an agency relationship. First, the city has no power to control the actions of the BHA. Under § 8-41, "[t]he powers of each authority shall be vested in the commissioners thereof." See *Better Home Heat Council, Inc.* v. *Housing Authority,* 148 Conn. 536, 538, 172 A.2d 610 (1961). It is true that the commissioners can be removed for cause by the city; General Statutes § 8-43;[9] but the city does not have the power to control the actions of the authority as it would were it a true principal of the BHA. See W. Seavey, Agency (1977) § (E) 3 ("[t]he right of the principal to direct what the agent shall do or shall not do is basic"). Second, under the powers of the authority under General Statutes § 8-44, the authority is not granted the power legally to bind the city. This is another essential element of a bona fide agency relationship. *Botticello* v. *Stefanovicz,* supra.

In the context of a taxpayer standing issue, this court said: "The housing authority is a distinct corporate entity. Cum. Sup. 1955, § 437d. It is not an agency of

---

[9] General Statutes § 8-43 provides: "REMOVAL OF COMMISSIONERS; SUBPOENAS. A commissioner of an authority may be removed by the appointing power for inefficiency, neglect of duty or misconduct in office, but a commissioner shall be removed only after opportunity to be heard in person or by counsel before the appointing power, at least ten days prior to which he shall have been given a copy of the charges against him. In the event of the removal of any commissioner, a record of the proceedings, together with the charges and findings thereon, shall be filed in the office of the clerk. Such appointing power, for its purposes under this section, may subpoena any books, papers, records, accounts, contracts, deeds, regulations or documents. Any person who wilfully refuses to produce such books, papers, records, accounts, contracts or documents shall be fined not more than five hundred dollars or imprisoned not more than six months or both."

the city of Hartford." *Austin* v. *Housing Authority,* 143 Conn. 338, 349, 122 A.2d 399 (1956). "A municipal authority created under a municipal authorities statute has been regarded as a corporate agency of the state and not a creature, agent or representative of the municipality organizing it." 1 E. McQuillin, *supra,* § 2.29a. Concerning a housing authority, the Rhode Island Supreme Court noted: "Once created it becomes an autonomous body, subject only to the limits of power imposed by law. . . . [They] are not instruments of the government created for its own uses or subject to its direct control." *Housing Authority* v. *Fetzik,* 110 R.I. 26, 33, 289 A.2d 658 (1972). Moreover, the cooperation agreement between the city and the BHA, states that the BHA is a separate corporate entity "organized and existing under the laws of the State of Connecticut within the City of Bridgeport." We conclude as a matter of law that part I of chapter 128 of the General Statutes does not establish an agency relationship between the city of Bridgeport and the BHA.

In the alternative, the plaintiff argues that an agency relationship existed for a particular purpose, i.e., providing police protection. The plaintiff points to two factors: the cooperation agreement between the two parties and the fact that the defendant city hired and placed six special police officers in the BHA's projects. This claim is not persuasive. In the cooperation agreement, the city agreed to furnish to the authority's housing project its "normal municipal services," including police protection. This "normal" level of police protection is no different from that offered to all other city residents. The agreement did not specify patrol levels or any other details of the protection offered. Therefore the level of protection offered was within the discretionary authority of the city and its representatives. By the plaintiff's logic, the city would have an agency relationship with every resident of Bridgeport. This is

untenable and we conclude that the cooperation agreement did not form the basis of an agency relationship between the city and the BHA. The plaintiff also points to the hiring of six police officers to patrol the BHA's projects to establish an agency relationship for a particular purpose. As explained earlier in this opinion, the plaintiff formerly and incorrectly believed that the city owned the Marina Apartments housing project. The six officers hired by the city "mostly remained" at Father Panik Village, another housing project that is separate and distinct from the Marina Apartments housing project. Contrary to the plaintiff's contentions, the city's actions in another housing project do not establish an agency relationship between the city and the BHA for any purpose in the project involved in this case.

There is no error.

In this opinion the other justices concurred.