[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANTS' POSTTRIAL MOTIONS
The plaintiff, John Murdock, a city of Hartford (city) police detective, was severely injured in the early hours of June 9, 1995, in a fight with his supervisor, Antonio Cancel, outside a local bar after both had ended their shift at the Hartford police department. After a trial, the jury award the plaintiff $1,000,000 in his suit against the defendants, Cancel; Joseph Croughwell, the chief of police; and the city.
The complaint was originally set forth in five counts. Count one (intentional assault and battery)[1] and count two (negligent assault and battery) were brought against Cancel only. Count three was brought against the city pursuant to General Statutes § 7-465 arising out of the negligent assault and battery claimed in count two. Count four (negligent supervision) was addressed to Croughwell in his official capacity as the former chief of the Hartford police department. Count five was brought pursuant to § 7-465 against the city arising out of the negligent supervision claim against Croughwell in count four.
The jury returned a verdict in favor of the plaintiff as to counts two, four and five. In count two, the jury attributed 34 percent of the negligence to the plaintiff and 66 percent of the negligence to Cancel. In response to the interrogatories relating to count three, the jury CT Page 2602 found that Cancel was not acting within the performance of his duties or within the scope of his employment at the time of the incident. In accordance with these interrogatory responses, the jury returned a defendnat's verdict in favor of the city as to count three. As reflected in their interrogatory responses concerning count four, the jury found that Croughwell was negligent in his supervision of Cancel and that the city was liable pursuant to § 7-465 as to count five.[2]
The verdict was returned on May 10, 2001. On June 5, 2001, pursuant to Practice Book §§ 16-35 and 16-37, Croughwell and the city filed a motion to set aside the verdict and for judgment notwithstanding the verdict. Although Cancel also filed a timely motion to set aside the verdict, the claim against Cancel settled posttrial. What remains pending before the court are Croughwell's and the city's motions to set aside the verdict, for judgment notwithstanding the verdict, for a new trial[3]
and for remittitur. In support of these motions, Croughwell and the city jointly claim that the evidence does not support the existence of a duty and, in any event, Croughwell is shielded from liability by the doctrine of governmental immunity. For the reasons articulated below, the motion to set aside the verdict is granted and judgment is ordered in favor of the remaining two defendants which renders the issue of remittitur moot.
 I Standard of Review
The "standard of review for motions to direct a verdict, motions to set aside a verdict and motions for judgment notwithstanding the verdict are the same." (Internal quotation marks omitted.) Medcalf v. WashingtonHeights Condominium Assn., Inc., 57 Conn. App. 12, 15 n. 2, 747 A.2d 532
(2000). "The setting aside of a verdict can occur for two general reasons. First, a trial court may set aside a verdict on a finding that the verdict is manifestly unjust because, given the evidence presented, the jury, mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case could be applied. . . . Second, a verdict may be set aside if its result justifies a suspicion that a juror or jurors were influenced by prejudice, corruption or partiality." (Citation omitted.) Novak v. Scalesse, 43 Conn. App. 94, 97-98,681 A.2d 968, cert. granted on other grounds, 239 Conn. 925, 682 A.2d 1004
(1996) (appeal withdrawn, May 13, 1997).
A "verdict will be set aside and judgment directed only if [the court finds] that the jury could not reasonably and legally have reached their conclusion. " (Internal quotation marks omitted.) Ham v. Greene,248 Conn. 508, 519, 729 A.2d 740, cert. denied, 528 U.S. 929,120 S.Ct. 326,145 L.Ed.2d 254 (1999). "The trial court should not set a verdict CT Page 2603 aside where there was some evidence upon which the jury could reasonably have based its verdict, but should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion. . . . Limiting that discretion, however, is the litigants' constitutional right to have issues of fact determined by a jury where there is room for a reasonable difference of opinion among fair-minded jurors." (Internal quotation marks omitted.) Purzycki v. Fairfield, 244 Conn. 101, 106-07, 708 A.2d 937
(1998). "In making this determination [as to whether to set aside a verdict], `[t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable.'" Gaudio v.Griffin Health Services Corp., 249 Conn. 523, 534, 733 A.2d 197 (1999), quoting Fink v. Golenbock, 238 Conn. 183, 208, 680 A.2d 1243 (1996). However, "[t]he trial court has the inherent power to set aside a jury verdict which, in the court's opinion, is either against the law or the evidence." (Internal quotation marks omitted.) Hunt v. Prior,236 Conn. 421, 428 n. 21, 673 A.2d 514 (1996). "The supervision which a judge has over the verdict is an essential part of the jury system." (Internal quotation marks omitted.) Palomba v. Gray, 208 Conn. 21, 24,543 A.2d 1331 (1988).
In considering a motion for judgment notwithstanding the verdict, the court "must consider the evidence, and all inferences that may be drawn from the evidence, in a light most favorable to the party that was successful at trial. . . . Judgment notwithstanding the verdict should be granted only if we find that the jurors could not reasonably and legally have reached the conclusion that they did reach. . . . If the jury, however, without conjecture could not have found established an element of the claim, the verdict on the claim cannot withstand a motion for judgment notwithstanding the verdict. . . . Consequently, the plaintiff must produce sufficient evidence to remove the jury's function from the realm of speculation. " (Citations omitted.) Craine v. Trinity College,259 Conn. 625, 635-36, ___ A.2d ___ (2002). "[A] motion [for judgment notwithstanding the verdict] should be granted if the evidence establishes, as a matter of law, that the party who had obtained the verdict could not and was not entitled to prevail. Gesualdi v.Connecticut Co., 131 Conn. 622, 627 [41 A.2d 771 (1945)]; Yeske v. AvonOld Farms School, 1 Conn. App. 195, 206 [470 A.2d 705 (1984)]." (Internal quotation marks omitted.) Lee v. Axiom Laboratories, Inc., Superior Court, judicial district of Hartford at Hartford, Docket No. 584562 (January 24, 2001, Peck, J.).
 II CT Page 2604
This case arises out of an incident which took place on June 9, 1995. The salient facts supported by the evidence are set forth as follows: Cancel was the sergeant in charge of the crimes against persons (CAPERS) division of the Hartford police department to which Murdock, a detective, was assigned. The CAPERS division consisted of six or seven detectives and a supervisor. The officers in CAPERS work in close proximity and typically have a lot of interaction with each other. The role of the sergeant is to assign and oversee investigations within the unit which include homicides; sexual assault, robbery and car jacking. Murdock was assigned to CAPERS in 1993. Cancel came to CAPERS in April 1994.
Both Cancel and Murdock were long time members of the Hartford police department and had been assigned together at various times over the course of their careers. Murdock joined the Hartford police department in 1973. Cancel joined in 1979. Both Murdock and Cancel appear to be physically powerful individuals. Murdock enlisted in the United States Marine Corps in 1967 at age nineteen. He served thirteen months in the infantry in Vietnam which included an assignment with the military police. In the course of his service, Murdock received several medals or commendations. Cancel had formal education until the ninth grade and ultimately received a GED. Cancel was promoted to sergeant in 1996.
Croughwell was a thirty-year veteran of the Hartford police department who became chief in January, 1994. As chief, he was responsible for efficiency, discipline and the good conduct of the department. He assigned Cancel to CAPERS in April 1994, after having previously worked with him in the Internal Affairs Division from 1991 to 1993. Cancel was already a sergeant at the time of this assignment to CAPERS. Being in charge of CAPERS did not require any special training. Cancel was trained in supervisory skills when he became a sergeant.
Following their shift which ended around 11:00 p.m. on June 8, 1995, Cancel, Murdock and other members of the CAPERS division met at a local bar on Weston Street in Hartford where it was karoake night. Although they regularly went there to have a few drinks after work, this night concluded with a fight between Murdock and Cancel in the parking lot around closing time in the course of which Murdock was seriously injured.
There had been one prior off-duty incident between Cancel and Murdock which arose out of union activity in support of members of the Springfield, Massachusetts, police department in 1987 or 1988, where Murdock claimed Cancel dumped a pitcher of beer over Murdock's head, and Cancel claimed Murdock spilled it on himself. Both of them had been drinking beer for a couple of hours at the time of the incident at a bar CT Page 2605 where all the officers had convened. During the incident, Murdock was restrained and removed from the premises by at least two officers. A week or so after this incident, Murdock and Cancel apologized to each other and shook hands. Thereafter, they backed each other up at work when called upon, had meals together and otherwise socialized from time to time enjoying what they each described as a good relationship. Murdock was initially pleased about Cancel's assignment to CAPERS, which came about six months after his own.
Croughwell was aware of one incident in 1984 when Cancel was disciplined for excessive force when he hit an accused on the knee with a nightstick while placing her in the backseat of a cruiser. Croughwell also knew of two incidents when Cancel exhibited aggressive behavior with Lou Brown, an NBC-TV30 reporter, which occurred during the time Cancel was supervisor of CAPERS. In the first incident, Cancel rudely kicked Brown out of the public works yard where Brown and a camera crew came to view an impounded vehicle. The second incident involved Cancel roughly escorting Brown out of the CAPERS division when Brown came to inquire about an arrestee who turned out to be a juvenile.
In March 1995, Murdock and his partner, Detective Nicholas Russo, went to see Croughwell in his capacity as police chief and complained about Cancel's quick temper and bullying supervisory style. Murdock and Russo requested the meeting with Croughwell because they were upset about the way Cancel handled a particular witness in a homicide case assigned to them. Murdock and Russo thought Cancel acted rudely toward the witness (who had given Murdock and Russo a written statement), which caused the witness to become enraged. They told Croughwell that Cancel was "on the edge" and a "loose cannon. " This was the only time either Murdock or Russo complained directly to Croughwell about Cancel prior to the incident on June 9, 1995.
Murdock never told Croughwell that he was in fear of his physical safety around Cancel either before or after the March meeting. In fact, even after Murdock and Russo complained to Croughwell about Cancel in March, 1995, Murdock continued to work with Cancel as usual. The episode between Murdock and Cancel on June 9, 1995, came as a surprise to Murdock. Murdock never expressed concern to his wife or anyone else that Cancel would hurt him. Murdock further testified that he was totally surprised at the violence of Cancel's act. Although there had been a prior violent episode in the late 1980s between Cancel and another officer, despite several invitations by the court (outside the presence of the jury), to present evidence on this crucial issue, the plaintiff failed to produce any evidence whatsoever that Croughwell had knowledge of it. The incident in question was resolved quickly within the chain of command, which at that time did not include Croughwell. CT Page 2606
After Detective Paul Sherakow was assigned to CAPERS in May 1994, perhaps in the Spring of 1995, he asked to meet with Croughwell outside of the department. Sherakow was concerned about tensions in the CAPERS division and pranks and antics but never mentioned any names. Sherakow did not complain to Croughwell about Cancel and had no basis to complain about Cancel. Croughwell had his deputies follow up on Sherakow's concerns by interviewing the detectives in CAPERS and, based on their investigation, found no basis for further action.
On the night of June 8, 1995, Murdock, Russo, Cancel and other members of CAPERS met at the bar they all referred to as "HoJo's" after 11:00 p.m. Over several alcoholic drinks, the group discussed overtime and other issues. Murdock drank four drinks of bourbon and water and Cancel drank several beers between 11:30 p.m. and 1:00 a.m. Murdock told Cancel that he should be more assertive with their supervisors about overtime and other issues of concern to the members of CAPERS. Cancel became defensive and then agitated when speaking of a certain prank involving a personal item of his and left the table. Around closing time, after continued drinking and some dancing, Cancel came back to the table where only Murdock and Detective Robert Lawlor remained and announced he was leaving. Murdock followed Cancel out the door, and Lawlor remained behind briefly to speak to the manager of the club. In the parking lot, Cancel and Murdock engaged in a physical altercation which resulted in the serious physical and emotional injuries to Murdock which are the subject of this lawsuit.
 III Duty
The overarching issue as to the viability of counts four and five is whether under circumstances of this case, Croughwell was duty bound to protect Murdock from what the evidence revealed to be an after work, off premises, unpredictable violent physical altercation between Cancel and Murdock. After a lengthy trial, exhaustive briefing and argument, examination and reexamination of the admissible evidence, the answer has to be that no such duty existed.
"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action. The nature of the duty, and the specific persons to whom it is owed, are determined by the circumstances surrounding the conduct of the individual." (Internal quotation marks omitted.) Lodge v. Arett SalesCorp., 246 Conn. 563, 571, 717 A.2d 215 (1998). "`The existence of a duty is a question of law and only if such a duty is found to exist does the CT Page 2607 trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . We have stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case. . . . The first part of the test invokes the question of foreseeability, and the second part invokes the question of policy.'" Gazo v. Stamford,255 Conn. 245, 250, 765 A.2d 505 (2001), quoting Mendillo v. Board ofEducation, 246 Conn. 456, 483-84, 717 A.2d 1177 (1998); see also Lodgev. Arett Sales Corp., supra, 246 Conn. 571-72.
Although the complaint in the instant case alleged a history of "violent" behavior by Cancel, the only evidence produced by the plaintiff on this issue consisted of a record in Cancel's internal affairs file of a 1984 disciplinary incident and testimony by several witnesses to the effect that Cancel was sometimes loud, rude, aggressive and intimidating. See Complaint, Count four, ¶¶ 6, 12-16, 40-41. There was no admissible evidence as to Cancel of what is commonly understood to be physically violent behavior. While the jury may well have been influenced by the unsuitability of Cancel for the role of supervisor and/or by the severity of the injuries to Murdock, the fact is that there was no evidence that would have put a reasonable person in Croughwell's position on notice that the incident of June 9, 1995, between Cancel and Murdock was even remotely a possibility. In particular, there was no evidence that Croughwell knew, should have known, or could reasonably anticipate that Cancel had the propensity to physically harm another police officer. Although Cancel admittedly had a bullying style, the risk of a violent assault by Cancel against a member of the CAPERS division which he supervised was not reasonably foreseeable.
Based on the foregoing, the court finds that there was no duty owing to Murdock from Croughwell to protect him from what the evidence proved to be a totally unforeseen risk. Even when viewed in the light most favorable toward sustaining the verdict, there is no evidence in support of imposing a duty upon which the jury could have reasonably based a verdict against Croughwell. Nor does public policy support finding a chief of police liable for an after work, off premises, physical altercation between two equally intimidating and experienced police officers admittedly under the influence of intoxicating liquor. The concept of duty even in the context of people who are related by employment cannot reasonably extend this far. CT Page 2608
In Connecticut, there is "only a limited duty to take action to prevent injury to a third person. Our point of departure has been that absent a special relationship of custody or control, there is no duty to protect a third person from the conduct of another. See 2 Restatement (Second), Torts § 315 (1965). . . . In any determination of whether even a special relationship should be held to give rise to a duty to exercise care to avoid harm to a third person, foreseeability plays an important role. . . . Although . . . no universal test for [duty] ever has been formulated . . . our threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . Thus, initially, if it is not foreseeable to a reasonable person in the defendant's position that harm of the type alleged would result from the defendant's actions to a particular plaintiff, the question of the existence of a duty to use due care is foreclosed, and no cause of action can be maintained by the plaintiff" (Citations omitted; internal quotation marks omitted.) Fraser v.United States, 236 Conn. 625, 632-33,674 A.2d 811 (1996).
Section 315[4] of the Restatement requires a special relationship between the actor and third person or the actor and other person in order for a duty to exist. The only way that the necessary special relationship to establish the existence of a duty owed to the plaintiff by Croughwell may arise is through the employer-employee relationship. Section 317 of the Restatement addresses liability to a third party in the context of the employer-employee relationship. Section 317 states: "A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if (a) the servant (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or (ii) is using the chattel of the master, and (b) the master (i) knows or has reason to know that he has the ability to control his servant, and (ii) knows or should know of the necessity and opportunity for exercising such control." 2 Restatement (Second), Torts, Duty of Master to Control Conduct of Servant § 317, p. 125 (1965). Comment (a) to § 317 states: "The rule stated in this Section is applicable only when the servant is acting outside the scope of his employment." 2 Restatement (Second), supra, § 317, comment (a). The jury found, and there is no question that, in connection with the incident giving rise to this lawsuit, Cancel was not acting within the performance of his duties or the scope of his employment. Accordingly, § 317 is instructive on the issue of duty in the present case.
Further, comment (b) to § 317 states in pertinent part that "the CT Page 2609 master . . . is under no peculiar duty to control the conduct of his servant while he is outside of the master's premises, unless the servant is at the time using a chattel entrusted to him as a servant. Thus, a factory owner is required to exercise his authority as master to prevent his servants, while in the factory yard during the lunch hour, from indulging in games involving an unreasonable risk of harm to persons outside the factory premises. He is not required, however, to exercise any control over the actions of his employees while on the public streets or in a neighboring restaurant during the lunch interval, even though the fact that they are his servants may give him the power to control their actions by threatening to dismiss them from his employment if they persist." 2 Restatement (Second), supra, § 317, comment (b).
While there are apparently no Connecticut cases factually similar to the present case, there are cases in other jurisdictions which are helpful. In Escobar v. Madsen Construction Co., 226 Ill. App.3d 92,589 N.E.2d 638 (1992), coemployees, Carlos Escobar and Xavier Watkins, were involved in a fight and shooting outside of work hours and outside of the scope of their employment. The plaintiffs, Carlos Escobar and his wife, sued the employer for negligent hiring and supervising of Watkins. Watkins was carpenter foreman and Escobar's supervisor. One night after work, the parties got into a fight in a bar near the job site. The following morning, when Escobar got out of his car before work, about two blocks from the job site, Watkins shot him. "One carpenter, a white man who was supervised by Watkins . . . stated in his deposition that Watkins [who is black] caused the continual racial problems on the job; on numerous occasions he screamed at the workers under him and he easily lost his temper. The carpenter got into an argument with Watkins and Watkins threatened to get his gun from the car and "take care' of the worker. The worker told the supervisor about the threat." Id., 638. "Several other carpenters, including Escobar, described Watkins in their affidavits as a mean person who was abusive to everybody." Id. The night of the fight, Escobar knocked Watkins down after Watkins attacked him. Carlson, Watkins' supervisor, knew of his violent tendencies and that he occasionally used cocaine. One of the plaintiffs' witnesses testified that "Watkins appeared to be high on cocaine on the morning of the shooting." Id., 639.
In affirming the trial court's granting of summary judgment, the Illinois Appellate Court stated that "[i]n this case Watkins was not on Madsen's job site, not doing Madsen's work, and not using Madsen's gun when he shot Escobar. Evidence of Watkins' orneriness and drug use, together with a report from one worker that Watkins had threatened to get his gun from his car, did not make the shooting a foreseeable consequence of hiring and supervising Watkins. The alleged negligent hiring and supervising could not have been a substantial factor in bringing about CT Page 2610 the shooting." Id., 640; see also Wise v. United States, 8 F. Sup.2d 535,549 (E.D.Va. 1998) (United States government owed no duty to a woman who had been sexually assaulted and murdered by off-duty members of a Navy SEAL team; the fact that the government has the power to exert complete authority over off-duty servicemen does not create a "special relationship" giving rise to a duty to control their off-duty actions);Bates v. Doria, 150 Ill. Dec. 191, 502 N.E.2d 454 (1986) (summary judgment for sheriff's department affirmed finding no connection between off-duty assault by deputy sheriff and his employment on grounds that the deputy did not obtain the weapon he used in the assault from his work and he was not at work at the time of the assault).
As in the aforementioned cases, the so-called "negligent assault" in the case before the court occurred off-duty, off the premises of employment and no "special relationship" existed between the chief and the plaintiff to give rise to a duty. Accordingly, the court conclude's that Cancel's assault of Murdock was not foreseeable by Croughwell and, under all the circumstances, no duty was owed to Murdock. Further, Croughwell, as a municipal chief of police, has far less authority over off-duty officers within the Hartford police department than the United States government has over off-duty members of the military. Croughwell could not have foreseen the assaultive conduct of Cancel off-duty and off city property. Nor did Croughwell's duty to supervise or train Cancel in connection with his employment give rise to either a duty to control Cancel's off-duty behavior toward a coworker or to warn anyone of assaultive behavior of which Croughwell had no notice. There was no duty and, therefore, no legally sustainable claim of negligence as to Croughwell.
 IV Governmental Immunity
The plaintiff's claims on the issue of governmental immunity suffer from the same lack of evidence as does the issue of duty. Even if Croughwell owed a duty of care to the plaintiff, he and the city are immune from liability under the doctrine of governmental immunity. "[M]unicipalities and their employees or agents have immunity from negligence liability for governmental acts involving the exercise of judgment or discretion. " Elliott v. Waterbury, 245 Conn. 385, 411,715 A.2d 27 (1998); see also Gordon v. Bridgeport Housing Authority,208 Conn. 161, 166, 544 A.2d 1185 (1988). "[A] municipal employee . . . has a qualified immunity in the performance of a governmental duty, but he may be liable if he misperforms a ministerial act, as opposed to a discretionary act." (Internal quotation marks omitted.) Purzycki v.Fairfield, supra, 244 Conn. 107. CT Page 2611
In deciding whether an action is barred by the doctrine of governmental immunity, "the court looks to see whether there is a public or private duty. . . ." Gordon v. Bridgeport Housing Authority, supra, 208 Conn. 170. "If a public duty exists, an official can be liable only if the act complained of is a ministerial act or one of the narrow exceptions to discretionary acts applies." Id. "[A]lthough the public duty doctrine provides the starting point of the analysis, distinctions between discretionary acts and ministerial acts are often controlling without regard to whether the duty is ascertained to be public or private." Id.[5] "[W]here the duty of the public official to act is not ministerial but instead involves the exercise of discretion, the negligent failure to act will not subject the public official to liability unless the duty to act is clear and unequivocal." (Internal quotation marks omitted.) Id., 167.
The Connecticut Supreme Court has held that "[i]t is firmly established that the operation of a police department is a governmental function, and that acts or omissions in connection therewith ordinarily do not give rise to liability on the part of the municipality." (Internal quotation marks omitted.) Id., 180; see also Stiebitz v. Mahoney, 144 Conn. 443,446, 134 A.2d 71 (1957) (hiring and firing police officers is a discretionary duty); Doe v. Nunes, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. 463832 (March 15, 1995,Handy J.). Since the claims of negligent supervision as to Croughwell allege failure to investigate, discipline and train, under the foregoing case law, they implicate purely discretionary functions of the chief of police.
The analysis, however, does not end here. The plaintiff in the present case argues that even if there was a duty in this case and the acts of Croughwell were discretionary, the "discrete person/imminent harm" exception applies. In Shore v. Stonington, 187 Conn. 147, 154-55,444 A.2d 1379 (1982), the Supreme Court recognized three exceptions to the immunity of public officials performing discretionary acts. They are: "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm . . . second, where a statute specifically provides for a cause of action against a municipality or municipal officer for failure to enforce certain laws . . . and third, where the alleged acts involve malice, wantonness or intent to injure, rather than negligence." (Internal quotation marks omitted.) Purzycki v.Fairfield, supra, 244 Conn. 108; see also Evon v. Andrews, 211 Conn. 501,505, 559 A.2d 1131 (1989).
The only applicable exception to the present case is the identifiable CT Page 2612 person/imminent harm exception. "The `discrete person/imminent harm' exception to the general rule of governmental immunity for employees engaged in discretionary activities has received very limited recognition in this state." Evon v. Andrews, supra, 211 Conn. 507. This exception applies "not only to identifiable individuals but also to narrowly defined identified classes of foreseeable victims." (Emphasis added.) Burns v.Board of Education, 228 Conn. 640, 646, 638 A.2d 1 (1994) (high school student who broke his arm on an ice patch on a heavily traveled walkway between school buildings is member of class of foreseeable victims).
The plaintiff in the present case argues that the he was a member of an identifiable class of foreseeable victims. The plaintiff also argues that the harm was imminent. "In delineating the scope of a foreseeable class of victims exception to governmental immunity, our courts have considered numerous criteria, including the imminency of any potential harm, the likelihood that harm will result from a failure to act with reasonable care, and the identifiability of the particular victim." Id., 647. Cancel's "negligent assault" of the plaintiff could have occurred "at any future time or not at all." See Evon v. Andrews, supra, 211 Conn. 508. The plaintiff relies on Purzycki v. Fairfield, supra, 244 Conn. 101, a claim brought on behalf of a elementary school child to support the contention that the harm here was imminent. The defendants correctly counter, however, that "[i]n Purzycki v. Fairfield . . . the Supreme Court interpreted the imminent harm requirement expansively, but still restricted it to cases involving a temporary condition, existing for a limited geographical area." (Defendant's Reply Memorandum, July 30, 2001, p. 13.) In Purzicki v. Fairfield, supra, 110, the exception applied for a one-half hour time period when second grade students were dismissed from the lunch room to an unsupervised school hallway leading to the outside play area during recess and a student was hurt when he was tripped by a fellow student. Purzicki is distinguishable from the present case because the harm was within a foreseeable time period, one-half hour, during lunch recess, and the geographic scope was limited to the specific hallway at the school leading from the lunch room to the playground.
In the present case, the harm alleged could have occurred anywhere at any time. The harm inflicted by Cancel was not restricted to a specific geographical area or limited time period as was the case in Burns andPurzicki. The injury, the time and the place were totally unforeseeable. Accordingly, the imminent harm exception is not applicable and the claim of negligent supervision against Croughwell is barred by the doctrine of governmental immunity. Because the liability of the city is dependent on the viability of the claim as to Croughwell, the claim against the city under § 7-465 is also barred. CT Page 2613
For all the foregoing reasons, the motion to set aside the verdicts as to counts four and five is granted. Judgment notwithstanding the verdict is entered in favor of the defendants, Croughwell and the city, as to both counts.
Peck, J.