MEMORANDUM OF DECISION
MANFREDI, J.
This matter was tried before the court on January 17, January 18, and January 24, 2013. Plaintiff Kimberly Kenneson represented herself. The defendant Mohegan Tribal Gaming Authority was represented by Attorney Robert Rhodes. Following the trial the defendant requested transcripts of the proceedings, and trial briefs were subsequently submitted.
This case arises out of an incident which occurred at the Mohegan Sun Casino on June 3, 2006. Plaintiff alleges that she sustained serious injuries as a result of an altercation which occurred when two patrons engaged in a fight.
The court has reviewed all of the exhibits which had been admitted at trial as well as the transcripts of testimony. Of particular interest is a video recording of the incident which is the basis of the claim. This recording was used at the trial and the court has viewed it again several times wrhen attempting to reconstruct the incident at issue.
Plaintiff is a 47-year-old woman who at the time of the incident alleged in the complaint was self-employed as a private investigator. On June 3, 2006 the plaintiff was attending a blackjack tournament at the Mohegan Sun Casino which was bemg held in the Rain Restaurant of the casino. The plaintiff was sitting at the bar in the restaurant with her cousin and another gentleman. The blackjack tournament was taking place in the rear of the restaurant away from the bar.
Michael Altman was a participant in the blackjack tournament and the eventual winner. Carl Rosati was a spectator at the tournament attending with a friend of his, Robert Coutu, who was a participant. Michael Altman testified at the trial of this case while Mr. Rosati’s testimony was received by way of deposition. The court finds that Mr. Altman’s testimony was less than credible, while the deposition testimony of Mr. Rosati on the whole made much more sense.
Mr. Altman testified that Mr. Rosati was trying to sell him stocks during the tournament and that he politely asked Mr. Rosati to refrain from doing so. Mr. Rosati on the other hand indicated in his deposition testimony that he and Mr. Altman exchanged “unpleasantries” and were both asked by the pit boss running the tournament to “shut up.” Mr. Altman told Mr. Rosati he was going to “get it” and gestured at Mr. Rosati with his middle finger. It is clear to the court that voices were raised and Ms. Kenneson was able to hear the exchange of unpleasantries between the two men at this time, including threats to kill. Although the plaintiff attributed the threats to Mr. Rosati and Mr. Rosati attributed the threats to Mr. Altman, it is clear that threats were exchanged in a manner loud enough to be heard at the bar area out front and by the pit boss or other casino personnel. Mr. Rosati’s deposition testimony supported the plaintiffs testimony in this regard in so far as threats being made.
Mr. Rosati then decided to leave the tournament area and use the restrooms. *263 In reviewing the video recording of the incident the court finds that Mr. Rosati left the tournament area and was escorted by two casino personnel. The recording clearly shows two men dressed in casino uniforms or suits walking behind Mr. Ro-sati while he was leaving the rear of the restaurant. Although they did not have their hands on him it is clear from the video recording that they were walking behind Mr. Rosati to ensure security in the area. As Mr. Rosati reached the stairs leading out of the restaurant the casino personnel waited and watched him walk down the stairs. They then turned and left him and returned to the tournament in the rear of the restaurant. Shortly thereafter, Mr. Altman is seen leaving the tournament area and walking to the front of the restaurant near the bar where Ms. Kenneson was located. At the same time Mr. Rosati returned to the restaurant area and proceeded up the steps behind an employee stationed on the steps, running to Mr. Altman where he attacked him. Mr. Rosati struck Mr. Altman several times and Mr. Altman attempted to fight back. During the altercation Ms. Kenne-son attempted to get out of the way and was pushed by both the men who were fighting, caught her foot in the bar rail and her body was jerked causing her certain injuries which the court will discuss later.
Eventually, the altercation was broken up and Mr. Rosati was taken into custody. The video shows personnel of the casino actually getting involved in the altercation and putting hands on the participants to break them apart.
Following the incident, Ms. Kenneson stayed at the casino overnight and subsequently sought medical attention for her injuries. As noted above, the court will discuss the issue of the plaintiffs injuries later on in its decision and now turns to the issue of liability.
LIABILITY
Pursuant to Section 3-250 of the Mohegan Torts Code, the Mohegan Tribal Gaming Authority waives its sovereign immunity and consents to be sued for tort claims arising under the code. Section 3-245 of the Code defines negligence as being:
“conduct that falls below the standard established by law or custom for the protection of others against unreasonable risk of injury or harm. The standard of conduct to which a person must conform to avoid being negligent is that of a reasonable person under similar circumstances.”
Additionally, Section 3—52(a) of the Code states that:
“the substantive law of the Mohegan tribe for application by the gaming disputes court shall be: ... The common law of the state of Connecticut interpreting the positive law adopted in subsection 2 above, which body of law is hereby adopted as and declared to be the common law of the Mohegan tribe for application by the gaming disputes court, except as such common law is in conflict with Mohegan tribal law.”
In her complaint the plaintiff essentially alleges that the Mohegan Tribal Gaming Authority was negligent in failing to provide proper security and prevent the harm which came to her as a result of the altercation between Mr. Altman and Mr. Rosa-ti. Specifically, it is her claim that the defendant should have removed both Mr. Altman and Mr. Rosati from the casino after threats were uttered by the parties.
Defendant on the other hand claims that there was no duty to prevent the intentional acts of Mr. Rosati and Mr. Altman in this matter because the injuries sustained by the plaintiff were not reasonably foreseeable, and that the defendant had no notice to anticipate the conduct of Mr. *264 Rosati. Defendant claims that the video surveillance of the incident does not support the plaintiffs version of events and therefore there can be no liability upon the defendant. Defendant further claims that to hold it liable in this matter would be imposing a duty to physically restrain patrons, and that the court should not impose such a duty upon its security officers.
“The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury . ,. Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action . .. Thus, [t]here can be no actionable negligence ... unless there exists a cognizable duty of care ... [T]he test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant’s position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant’s responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case ...” (Internal quotation marks omitted.) Murdock v. Croughwell, 268 Conn. 559, 566, 848 A.2d 363 (2004). Ultimately, “[t]he existence of a duty [of care] is a question of law.” Gordon v. Bridgeport Ho'tising Authority, 208 Conn. 161, 171, 544 A.2d 1185 (1988). “Therefore, the question of whether a defendant owed a duty of care to an injured party is properly decided in the context of a motion to strike.” Patterson v. Foley, Superior Court, judicial district of New London, Docket No. CV 08 5007342 [2009 WL 2357124] (June 16, 2009, Martin, J.), citing Gordon v. Bridgeport Housing Authority, supra, at
171-72 [544 A.2d 1185]. Generally, “there is no duty to control the conduct of a third person.” Murdock v. Crough-well, supra, 268 Conn, at 567 [848 A.2d 363]. “One exception to this general rule arises when a definite relationship between the parties is of such a character that public policy justifies the imposition of a duty to aid or to protect another ... In delineating more precisely the parameters of this limited exception to the general rule, [the Supreme Court] has concluded that, [in the absence of] a special relationship of custody or control, there is no duty to protect a third person from the conduct of another.” (Citations omitted; emphasis in original; internal quotation marks omitted.) Ryan Transportation, Inc. v. M & G Associates, 266 Conn. 520, 526, 832 A.2d 1180 (2003). “The relationships included from which a duty to control might arise include parent/child; master/servant; landowner/licensee; charge/ ward.” Castel v. Derose, Superior Court, judicial district of Fairfield, Docket No. CV 106006363 (January 11, 2011, Dooley, J.), citing 2 Restatement (Second), Torts §§ 316-19 (1965). “[Ajbsent a special relationship of custody or control, there is no duty to protect a third person from the conduct of another.” Kaminski v. Fairfield, 216 Conn. 29, 33, 578 A.2d 1048 (1990).”
Additionally, Section 302B of the Restatement of Torts Second states:
“An act or omission may be negligent if the actor realizes or should realize involves unreasonable risk of harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.”
Section 318 of the restatement states:
*265 “if the actor permits a third person to use land or chattels in his possession otherwise than as a servant, he is, if present, under a duty to exercise reasonable care so as to control the conduct of the third person as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the actor
(A) knows or has reason to know that he has the ability to control the third person, and
(B) knows or should know of the necessity and opportunity for exercising such control.”
In this case the court must determine whether or not the defendant owed a duty under the circumstances set forth above to prevent harm to the plaintiff. The court concludes that it did. Here, Altman and Rosati were both upon the defendants land (the casino) other than as a servant since they were attending a blackjack tournament at the invitation of the defendant. Therefore the defendant had a duty to control their conduct when such conduct created or could create an unreasonable risk of harm to the plaintiff. The defendant essentially argues that it did not know or have no reason to know that Rosati had any violent tendencies and that the attack on Mr. Altman occurred suddenly and without warning. However, the court has determined that Mr. Altman and Mr. Rosati engaged in ongoing threats during the blackjack tournament, loud enough and disruptive enough to cause a pit boss to tell them to “shut up.” When Mr. Rosati was leaving the tournament area it is clear that he was followed by casino personnel who did not return to the tournament until they saw that Mr. Rosati had left the Rain Restaurant.
Under these circumstances the court finds that the defendant, its agents or employees had sufficient information to determine that a clear threat of the altercation existed between these two men. The reasonable course of action for casino personnel at this time would have been to ensure that one or both of the people involved were ejected from the casino. This was not done. Leaving Mr. Rosati to his own devices after he left the Rain Restaurant and not ensuring that he had left the premises was negligent conduct which ultimately led to the plaintiffs injuries. Where threats were made and perceived by casino personnel the reasonable course of action would be to eject one or both of the participants.
The court concludes that in the circumstances the defendant had a duty to protect Ms. Kenneson from the very type of conduct which Mr. Rosati and Mr. Altman engaged in. The fact that such an occurrence may not have happened previously in the casino does not relieve the defendant of its duty to protect its invited patrons from the violence of others where the defendant has information in its possession of an ongoing threat. The facts in this case are readily distinguishable from those in Stewart v. Federated Department Stores Inc., 234 Conn. 597, 662 A.2d 753 (1995) where liability was premised upon the lack of adequate security in an area where criminal conduct was common. Here, the court is basing its decision upon the serious ongoing situation wherein the actors and threats were known and imminent.
It is the court’s determination that the defendant’s failure to remove Mr. Rosati and Mr. Altman from one another in a effective manner was a proximate cause of the plaintiffs injuries, i.e., it was a substantial factor in the harm which resulted to the plaintiff. The defendant had actual notice of the danger of an outbreak of violence between Rosati and Altman and *266 such danger was clearly within the scope of risk created by the defendant’s negligent conduct, “[T]he fact that the [defendant] neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent it from being liable.” (Internal quotation marks omitted.) Merhi v. Becker, 164 Conn. 516, 521, 325 A.2d 270 (1973).
DAMAGES
The plaintiffs medical history and treatment following the incident at the casino is confusing at best. She initially treated with Dr. Rosa on June 6, 2006. At that time she reported on her patient information form pain in her lower back, her left arm, and her jaw. She treated with Dr. Rosa several times a week between June 6 and October 3, 2006. During that time the office notes reflect that her complaints always centered around her neck and back. It was not until after the October 1, 2006 automobile accident that Dr. Rosa’s notes indicate complaints of moderate headaches on a regular basis. Additionally following the October 1, 2006 accident Dr. Rosa’s notes begin to reflect severe lumbar pain and positive percussion at L2-L5 and Ll-4/5. Dr. Rosa released her from treatment on April 9, 2007 indicating that her condition had plateaued and that she had self-imposed work restrictions. He indicated on May 5, 2007 that she could work full-time for duty.
Dr. Rosa also wrote a letter to Attorney Mowad on October 2, 2006 in which he indicated that he felt she had a 14% permanent partial disability rating to her cervical spine with 4% being attributed to a pre-existing degenerative condition. He did not indicate if any of this rating was apportioned between the casino incident or the motor vehicle accident.
The plaintiff continued to treat with Dr. Rosa throughout 2007, 2008, and through September 2009. He referred her to Dr. Patricia Richard for TMJ consultation in August 2008.
The plaintiff went to see Dr. Richard, a reconstructive orthopedic surgeon, on October 4, 2006. Dr. Matza recorded two office notes on that date, one relating to the incident at the casino on June 3 and one relating to the automobile accident of October 1. Her next visit to Dr. Matza was apparently on May 7, 2007. He indicated that she had a cervical strain, mid thoracic back strain, low back strain and postcon-cussive headaches. Her next visit to Dr. Matza was on July 30, 2008 where he indicated she had cervical spondylosis with strain, had reached maximum medical improvement and was left with a 17% permanent partial disability of her back. He also indicated she had TMJ and post eon-cussive syndrome “all of which are from the accident.” However he does not indicate which accident they were related to. In a note dated June 6, 2011 Dr. Matza ventures an opinion that her aggravated cervical spondylosis, cervical strain, and low back strain were caused by the injury of June 3, 2006. He does not mention the automobile accident in this note. On June 20, 2011 he notes that she has a history of fibromyalgia which is impacting her symptoms.
On December 21, 2011 Dr. Matza refers her for an EMG nerve study. On January 23, 2012 Dr. Matza notes the EMG study is normal and that an MRI of her low back was unremarkable with no herniations. He recommends the use of Advil. On January 23, 2012 Dr. Matza writes that the plaintiff now has a 24% permanent partial disability of the back due to a combination of bone and disc protrusion but does not indicate what the cause is of this disability. On March 5, 2012 Dr. Matza writes another note indicating he’s been following her for injuries sustained in the incident of *267 June 3, 2006 and states that she will not be able to continue working at her current pace because of increased symptomology and progressive degenerative changes. However, it is unclear whether he is relating this opinion to the injuries received in this incident or not and he does not mention the automobile accident of October 1, 2006 at all. Additionally, it is unclear as to when a concussion was caused and what may have caused it.
It should be noted that following the automobile accident of October 1, 2006 the plaintiff was seen at the emergency room at St. Mary’s Hospital in Waterbury. She complained of neck and back pain and was diagnosed with my mild cervical and lumbar strain. As a result of that automobile accident plaintiff also brought a claim against the driver of the vehicle who caused that collision. In that case she claimed essentially the same injuries which are at issue in this ease and ultimately settled that matter for $46,000.
Also of note is that the plaintiff also sued the tortfeasors in this case Michael Altman and Carl Rosati. She settled that case with Michael Altman for the sum of $67,000.
As noted previously, plaintiff had been referred to Dr. Richard for evaluation of her TMJ issue. The court has reviewed Dr. Richard’s office notes as well as various letters written by her. The court is unable to decipher the office notes and is left to utilizing the letters written by Dr. Richard to understand her treatment and opinions regarding the plaintiff’s condition.
In an August 28, 2008 letter to Attorney Mowad, Dr. Richard relates the history given to her by the plaintiff concerning this incident with only one sentence concerning the October 1, 2006 automobile accident. She notes that the plaintiff had incisor to incisor openmg in her mouth upon examination of 50 mm and a baseline malocclusion as well as maxillary posterior cross bite, missing mandibular premolars and an occlusion into the fossa of the mandibular premolar. An MRI done at Dr. Richard’s request on November 30th 2008 notes a cortical irregularity along the lateral aspect of the left condylar head which may represent early degenerative articular change and an otherwise normal appearance to the temper mandibular joints, with no evidence of derangement of the temporomandibular discs.
Dr. Richard has opined that the plaintiff sustained an injury to her temporomandib-ular joint as a result of the casino incident leaving her with a 10% impairment of her jaw function. She has also given an opinion that the plaintiff suffers from fibro-myalgia as a result of the casino incident. She apparently does not attribute any of plaintiffs injuries to the October 1, 2006 automobile accident.
In addition to the medical providers mentioned, the plaintiff has also seen a variety of other physicians and healthcare providers. The court notes the following. A July 30, 2007 MRI of the C-spine at Yale New Haven Hospital which noted a mild disc osteophyte closing mild neural forami-nal narrowing. An EMG done at Yale by Dr. Goldstein on October 29, 2007 showed no evidence of cervical radiculopathy. On October 26, 2007 an MRI of the brain was unremarkable. On March 19, 2008 a consultation at Yale with Dr. Weiss indicated severe persistent TMJ pain existing since the motor vehicle accident of October, 2006 and other traumatic injuries of that year.
The plaintiff also consulted with Dr. Elizabeth Jonas a neurologist at Yale. She had visits with her from November 23, 2011 and through the following year. The EMGs and MRIs done at Dr. Jonas’s request all essentially came back normal.
*268 A consultation and notes from the UConn Health Center TMD/Faeial Pain Clinic on August 27, 2009 indicate the range of motion in her jaw was good and a negative need for surgery indicating that the pain was likely due to “MPD,” psychosocial stressors and clenching.
On August 20, 2009 the plaintiff saw Dr. Mushaweh. He noted a diffuse sympto-mology with probable fibromyalgia. He found no cervical radiculopathy or correctable lesions and offered no opinion as to causation.
At trial Dr. Anthony Spinella and Dr. Eric Googel testified for the Defendant. Dr. Spinella, an orthopedist, examined the Plaintiff and reviewed her records. Dr. Googel, a dentist, performed a record review.
The essence of Dr. Spinella’s testimony was that virtually all of the treatment received by Plaintiff after October 1, 2006 was related to the motor vehicle accident and that the osteophyte seen in the July, 2006 MRI would have taken months or years to form and could not have been caused by the incident which occurred at the casino in June, 2006. Furthermore, it was the osteophyte which caused the herniation seen in the MRI and the herniation was insufficient to produce radicular symptoms. This opinion was corroborated by reports from St. Mary’s hospital, Dr. Mu-shaweh, and Dr. Goldstein.
Dr. Googel’s testimony at its core was that Plaintiff does not have a TMJ injury or syndrome since her MRI was normal and that her jaw range of motion was also within normal limits and showed no evidence of derangement of the TM joints. Any TMJ symptoms she may have are likely the result of the car accident or stress. This was also corroborated by reports from the UCONN TMD/Facial Pain Clinic.
The court concludes that Ms. Kenneson was injured at the casino, but the extent of her injuries was limited in time and intensity. By October 2, 2006 Dr. Rosa rated her with a permanent partial disability for that incident. The motor vehicle accident was obviously a much greater trauma and it wasn’t until after that accident that Dr. Rosa began treating her for headaches and jaw pain. Although she did note these issues in her intake with him, his treatment notes between June and October, 2006 do not mention these issues. Dr. Matza produced two different notes for October 4, 2006. One does not mention the motor vehicle accident at all.
It is not until July 80, 2008 that Dr. Matza’s records mention that TMJ pain has developed and then treatment begins with Dr. Richard. Dr. Richard’s reports give very little, if any, weight to the effects of the motor vehicle accident; although it was clearly a substantial collision and her headaches and continuing complaints of jaw pain did not become steady until well after the car accident.
The court finds no evidence of loss of income or impairment of earning capacity.
The court finds that Plaintiff was injured as a result of Defendant’s negligence, and that the reasonable and necessary medical expenses related to the injuries sustained are those for Dr. Rosa’s treatment from June 6, 2006 through September 29, 2006 totaling $4,610.00, and for the Advanced Radiology bills of July 18, 2006 and August 3, 2006 totaling $2,240.00 for a grand total of $6,850.00.
The court awards damages to the Plaintiff and against the Defendant in the amount of $20,550.00.